# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## NORTHERN DIVISION
## AT COVINGTON

**CIVIL ACTION NO. 10-184-DLB-CJS**

**BARBARA JEAN MUDD, ET AL.**                                   **PLAINTIFFS**

**vs.**                       **MEMORANDUM OPINION & ORDER**

**SHELLY ANN YARBROUGH, ET AL.**                               **DEFENDANTS**

* * * * * * * * * * * * * * *

This case arises from a dispute over the proceeds of a $400,000 Servicemembers' Group Life Insurance (SGLI) plan held by decedent Robert Lawrence Mudd. The underlying legal question is straightforward: Was Mudd's January 2009 modification to his life insurance beneficiary form valid? First, however, the Court must confront a myriad of procedural questions to determine whether it has jurisdiction and whether venue is proper in the Eastern District of Kentucky.

This matter is before the Court on Defendant Shelly Ann Yarbrough's Motion For Leave to File an Amended Answer (Doc. # 35) and her Motion to Dismiss for Lack of Personal Jurisdiction or Alternatively to Transfer. (Doc. # 36). Oral argument on the motions was conducted on April 1, 2011. Plaintiffs were represented by Robert A. Winter, Jr. and Peter J. Summe, and Defendant Yarbrough was represented by Gary J. Sergent. The motions have been fully briefed (Docs. # 35, 36, 40, 43, 48) and are ripe for review. For the reasons that follow, Defendant's motions are **denied**.

# I.    BACKGROUND

Decedent Robert L. Mudd enlisted in the U.S. Navy from Kentucky. (Docs. # 38; 39 ¶ 3). He was then ordered to Illinois for basic training, next to South Carolina for nuclear training, and then to his station in Georgia. (Docs. # 38, 39 ¶ 3). Though the record is not conclusive, it appears that while stationed in Georgia, Mudd met Shelly Ann Yarbrough. The two were married on May 21, 2004 in Jacksonville, Florida and, after living a short time in Georgia, purchased a residence in Florida. (Doc. # 36-2 at 18 ¶ 4).

Mudd and Yarbrough were divorced on May 2, 2006, though both continued living in Florida. (Doc. # 36-2 at 18 ¶ 6). Less than a year later, on January 1, 2007, Mudd and Yarbrough remarried in Las Vegas, Nevada; both listed Florida as their residence. (Doc. # 36-2 at 18 ¶ 7) Then, in May 2007, Mudd was transferred to Hawaii and Yarbrough accompanied him there. (Doc. # 36-2 ¶ 8). Yarbrough returned to Florida in August 2007, but not before signing a "Separation Agreement" that Mudd had prepared. (Doc. # 36-2 at 18 ¶ 8, 19 ¶ 12).

On June 5, 2007, before Yarbrough left Hawaii, Mudd completed an SGLI Election Form in which he designated his mother and Yarbrough as equal, co-beneficiaries of a $400,000 life insurance policy. (Docs. # 1 ¶ 16; 1-2). Yarbrough, however, was unaware that Mudd even had a life insurance policy until after Mudd's death. (Doc. # 36-2 at 18 ¶ 7).

On January 30, 2009—nearly a year-and-half after initially completing the SGLI Election form and long after Yarbrough had returned to Florida—Mudd obtained a copy of the form, and in the section titled "Beneficiary(ies) and Payment Options," drew a line

through the name "Shelly Ann Mudd,"[1] her relationship to him (wife), designated share (50%), and payment option (36 payments). Decedent initialed next to the alteration, signed at the bottom of the form, and dated it "1/30/2009." (Doc. # 1-2). Mudd did not alter the writing designating his mother a 50% beneficiary of the life insurance policy. On March 6, 2010, Mudd died while off duty in Hawaii. (Doc. # 1-3).

The Navy's Report of Casualty indicated that the beneficiary was an "unclear designation," which prompted letters from Prudential's Office of Servicemembers' Group Life Insurance (OSGLI) to decedent's mother, Barbara Jean Mudd, and wife, Shelly Ann Yarbrough. (Doc. # 36-5 at 1-6). The letters informed the parties that this was a case of "unclear intent" and offered them release forms, by which they could simultaneously propose and authorize distribution of the proceeds. The parties were unable to agree on the appropriate distribution of the death benefit. (Doc. # 36-5 at 8-9). Subsequently, decedent's mother and co-administrators of his estate brought this action against Yarbrough, Prudential Insurance Company of America, and the United States,[2] seeking declaratory judgment that decedent's mother is the sole beneficiary of his life insurance policy, or alternatively, that decedent's mother and estate are equal co-beneficiaries of the policy. (Doc. # 1).

Yarbrough responded by filing a crossclaim and counterclaim seeking a declaration that she is entitled to at least half of the death benefit. (Doc. # 18). Defendant Prudential

---

[1] Defendant indicates in her Answer that she no longer uses the "Mudd" surname and is now "Shelly Ann Yarbrough." Thus the Court refers to Defendant as "Shelly Ann Yarbrough" and has altered the case caption to reflect this change.

[2] The United States was dismissed early in this action because (1) it is shielded from liability by sovereign immunity and (2) Prudential, not the United States, is the insurer and administrator of the insurance policy at issue. (Doc. # 29).

then filed a crossclaim and counterclaim in interpleader seeking to pay the full $400,000 death benefit, plus interest, to the Court and be discharged, thereby permitting Plaintiffs and Defendant Yarbrough to litigate proper allocation of the death benefit.  (Doc. # 21). Following a status conference, the parties submitted a joint motion, which the Court granted, permitting Prudential to pay the full death benefit to the Court and be dismissed from the action.  (Docs. # 31, 33, 34).  Shortly thereafter, Defendant Yarbrough filed the pending Motion for Leave to File an Amended Answer (Doc. # 35) and Motion to Dismiss (Doc. # 36).

## II.     ANALYSIS

### A.     Motion to Dismiss for Lack of Personal Jurisdiction

#### 1.     Interpleader generally

"Interpleader is procedural device which entitles a person holding money or property, concededly belonging at least in part to another, to join in a single suit two or more persons asserting mutually exclusive claims to the fund."  *White v. Fed. Deposit Ins. Corp.*, 19 F.3d 249, 251 (5th Cir. 1994).  Interpleader actions are remedial in nature, so the governing rules and statutes are to be liberally construed.  *State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523, 533 (1967).

There are commonly two stages to interpleader actions.  First, "the court determines whether the stakeholder has properly invoked interpleader, including whether the court has jurisdiction over the suit, whether the stakeholder is actually threatened with double or multiple liability, and whether any equitable concerns prevent the use of interpleader." *United States v. High Tech. Prods., Inc.*, 497 F.3d 637, 641 (6th Cir. 2007) (citing 7 Charles

Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 1704 (3d ed. 2001)).  Second, "the court determines the respective rights of the claimants to the fund or property at stake via normal litigation processes, including pleading, discovery, motions, and trial."  *Id.*  This interpleader action is in the first stage.

As directed by the Sixth Circuit, the "primary test" for determining whether interpleader is appropriate is to consider "whether the stakeholder legitimately fears multiple vexation directed against a single fund or property," which is known as the "stake."  *Id.* at 642 (quoting 7 Fed. Prac. & Proc. Civ. § 1704).  The Sixth Circuit's requirement of a "legitimate" fear of overlapping litigation does not imply review of the merits of the adverse claims, which should instead be reserved for the second-stage of interpleader.  7 Fed. Prac. & Proc. Civ. § 1704; *see also, John Hancock Mut. Life Ins. Co. v. Kraft*, 200 F.2d 952, 954 (2d. Cir. 1953) ("In an interpleader action, the jurisdiction of the court is not dependent on the merits of the claims of the defendants").  Instead, the Sixth Circuit has found this requirement satisfied where multiple claimants present competing claims for the same identifiable products.  *High Tech. Prods.*, 497 F.3d at 642.

In this case, Plaintiffs Barbara Jean Mudd and decedent's estate, as well as Defendant Yarbrough, made competing claims on $200,000 of the death benefit previously held by Defendant Prudential.  (Doc. # 21 ¶¶ 14-18).  Prudential, in turn, was unable to determine which party was entitled to the death benefit and alleged that it "is or may be exposed to multiple liability."  (Doc. # 21 ¶ 21).  Because Prudential was subject to competing claims for the same funds, this action was appropriately brought as an interpleader.  (Doc. # 21 ¶ 25).

**2.     Because the elements of statutory interpleader are satisfied, the Court has subject matter jurisdiction under the Federal Interpleader Act**

There are two approaches to interpleader in federal courts, commonly referred to as "rule interpleader" and "statutory interpleader."  Rule interpleader is brought pursuant to Fed.R.Civ.P. (Rule) 22, while statutory interpleader is brought pursuant to the Federal Interpleader Act, codified at 28 U.S.C. §§ 1335, 1397, 2361.  The primary distinction between the two types of interpleader is that "unlike the interpleader statute which grants district courts original jurisdiction, the interpleader rule is merely a procedural device and does not grant this Court subject matter jurisdiction."  *Sun Life Assur. Co. of Canada v. Thomas*, 735 F.Supp. 730, 732 (W.D.Mich. 1990) (citing *Bell & Beckwith v. United States*, 766 F.2d 910, 914 (6th Cir. 1985)).  Accordingly, "[i]n an action brought pursuant to the interpleader rule, either federal question jurisdiction or diversity jurisdiction must be established."  *Id.*  Interpleader actions brought pursuant to Rule 22 are also subject to the same venue, Rule 4 service of process, and anti-injunction limitations as regular civil cases. Richard D. Freer, 4-22 Moore's Federal Practice-Civil § 22.04[1].

By contrast, statutory interpleader "enjoys liberal procedural rules including relaxed venue, personal jurisdiction and service of process requirements as well as broad discretion to enjoin overlapping litigation."  *Bhd. Mut. Ins. Co. v. United Apostolic Lighthouse, Inc.*, 200 F.Supp.2d 689, 694 (E.D.Ky. 2002) (citing 28 U.S.C. §§ 1397, 2361). Most importantly, statutory interpleader grants district courts "original jurisdiction of any civil action of interpleader or in the nature of interpleader" if three elements are satisfied.  28 U.S.C. § 1335(a).  First, the amount in controversy must exceed $500.  28 U.S.C. § 1335(a); *Thomas*, 735 F.Supp. at 731.  Second, there must be two or more adverse

claimants to the stake who are of diverse citizenship, as defined by 28 U.S.C. § 1332. 28 U.S.C. § 1335(a)(1); *Thomas*, 735 F.Supp. at 731-32. Finally, the stake must be deposited into the Court's registry. 28 U.S.C. § 1335(a)(2); *Thomas*, 735 F.Supp. at 732. Because all three elements are satisfied, the Court has jurisdiction over this statutory interpleader action.

First, the amount in controversy must exceed $500. This element is satisfied where an insurance policy in dispute is valued at more than $500. *See, e.g., John Hancock Mut. Life Ins. Co. v. Brown*, 73 F.Supp. 982, 983 (E.D.Mich. 1947) ("This court acquired jurisdiction of this controversy, as an interpleader action instituted by an insurance company obligated upon a policy of insurance of more than $500"). The stake here is a life insurance policy worth $400,000. (Docs. # 21 ¶ 12; 33; 34). The parties have indicated that half the proceeds, $200,000, are in dispute. (Doc. # 31 at 2). Accordingly, the amount in controversy exceeds $500.

Second, there must be minimal diversity, "that is, diversity of citizenship between two or more claimants, without regard to the circumstance that other rival claimants may be co-citizens." *Tashire*, 386 U.S. at 530. The parties do not dispute that Plaintiff Barbara Jean Mudd is a citizen of South Carolina and Defendant Shelly Ann Yarbrough is a citizen of Florida. (Docs. # 1 ¶ 1, 4; 21 ¶ 3, 5; 43 at 9). These two facts establish minimal diversity. The citizenship of the disinterested stakeholder or of any other claimant is, therefore, irrelevant. *Brotherhood,* 200 F.Supp.2d at 694 (citing *Treinies v. Sunshine Mining Co.*, 308 U.S. 66, 72 (1939)).

Finally, the money or property in controversy must be deposited into the Court's registry. *See, e.g., U.S. Fire Ins. Co. v. Asbestospray, Inc.*, 182 F.3d 201, 210 (3d Cir.

1999) ("A proper deposit or bond is a jurisdictional prerequisite to bringing an interpleader"). This element is satisfied because Prudential deposited the full death benefit into the Court's registry. (Doc. # 47). Because all three statutory requirements have been satisfied, the Court has jurisdiction over this interpleader action pursuant to the Federal Interpleader Act, 28 U.S.C. § 1335.

### 3. The Court has personal jurisdiction over the claimants, including Defendant Yarbrough

In her Motion to Dismiss, Defendant Shelly Ann Yarbrough argues that the Court lacks personal jurisdiction over her because she lacks "minimum contacts" with Kentucky. This argument, however, is founded on Defendant's conclusion that the Court has only diversity jurisdiction, and not an independent basis for jurisdiction—a conclusion the Court rejected *supra* Part II.A.2 in finding that statutory interpleader grants the Court original subject matter jurisdiction over this action. Thus, although correct, Defendant's observation that a federal court sitting in diversity is limited in its exercise of personal jurisdiction by the state's long-arm provision and the Fourteenth Amendment's Due Process Clause is irrelevant to whether the Court has personal jurisdiction over Defendant Yarbrough. *See Neogen Corp. v. Neo Gen Screening, Inc.* 282 F.3d 883, 888 (6th Cir. 2002) ("A federal court's exercise of personal jurisdiction in a diversity of citizenship case must be both (1) authorized by the law of the state in which it sits, and (2) in accordance with the Due Process Clause of the Fourteenth Amendment"). Instead, where, as here, a federal court exercises federal question jurisdiction, "the constitutional limits of the court's personal jurisdiction are fixed . . . not by the Fourteenth Amendment but by the Due Process Clause of the Fifth Amendment." *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618 (1st

Cir. 2001) (quoting *United Elec., Radio & Mach. Workers of America v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1085 (1st Cir. 1992)).

The Federal Interpleader Act, 28 U.S.C. § 2361, permits nationwide service of process. It allows the Court to "issue its process for all claimants" and "shall be addressed to and served by the United States marshals for the respective districts where the claimants reside or may be found." Courts are clear that service of process pursuant to the Federal Interpleader Act is sufficient to establish personal jurisdiction over Defendant Yarbrough, at least to the extent she claims the proceeds of decedent's life insurance policy. Referring to statutory interpleader, a court in the Western District of Kentucky determined that "[t]his statute confers jurisdiction over all the defendants served, even those residing" outside the district. *Stitzel-Weller Distillery, Inc. v. Norman*, 39 F.Supp. 182, 188 (W.D.Ky. 1941); *see also, Great Lakes Auto Ins. Grp. of Chicago, Ill. v. Shepherd*, 95 F.Supp. 1, 5 (W.D.Ark. 1951) ("Section 2361, 28 U.S.C.A., authorizes service of process in the district were the 'claimants reside or may be found'. Clearly, therefore, this court acquired jurisdiction of the defendants . . . by virtue of the service on them in Illinois, at least for purposes of adjudicating their claim, if any, to the fund deposited in the court").[3] Defendant's counsel conceded at oral argument that Defendant Yarbrough was properly served. Accordingly, as Plaintiffs correctly argue, Defendant "is amenable to suit in this Court even if she lacks

---

[3] Treatises and scholars are in accord. *See, e.g.,* 4-22 Moore's Federal Practice-Civil § 22.04[3][c] ("Thus, claimants in a statutory interpleader proceeding may be served with process anywhere in the United States, even if they lack minimum contacts with the state in which the federal interpleader court sits"); 7 Fed. Prac. & Proc. Civ. § 1711 ("[T]his statutory assertion of jurisdiction seems clearly warranted and constitutional and it is not necessary for the federal court to concern itself with whether the claimants have minimum contacts with the forum state"); Donald L. Doernberg, *What's Wrong With This Picture?: Rule Interpleader, the Anti-Injunction Act, In Personam Jurisdiction, and M.C. Escher*, 67 U. Colo. L. Rev. 551, 562 (1996) ("Perhaps the most interesting feature of the statute is the provision for nationwide service of process with the concomitant establishment of personal jurisdiction by such service") (citations omitted).

minimum contacts with Kentucky." (Doc. # 43 at 10).

Faced with an argument similar to Plaintiffs', the Sixth Circuit in *Medical Mutual of Ohio v. deSoto*, 245 F.3d 561 (6th Cir. 2001) reached two conclusions that control this case. First, the court held "that Congress has the power to confer nationwide personal jurisdiction" and that one way to do so is by providing for nationwide service of process. *Id.* at 567. The Sixth Circuit explained that "[b]ecause of the national service of process provision, the district court's exercise of jurisdiction was not 'extra-territorial but rather nationwide.'" *Id.* (quoting *Haile v. Henderson Nat'l Bank*, 657 F.2d 816, 826 (6th Cir. 1981)); *see also*, *United Liberty Life Ins. Co. v. Ryan*, 985 F.2d 1320, 1330 (6th Cir. 1993) (finding that the nationwide service of process provision in the Securities Exchange Act of 1934 "confers personal jurisdiction in any federal district court over any defendant with minium contacts to the United States").

Second, the Sixth Circuit concluded in *deSoto* that exercising nationwide personal jurisdiction pursuant to the federal statute in question did not fun afoul of Fifth Amendment Due Process considerations. The court explained that "when a federal court exercises jurisdiction pursuant to a national service of process provision, it is exercising jurisdiction for the territory of the United States and the [Fifth Amendment Due Process] individual liberty concern is whether the individual over which the court is exercising jurisdiction has sufficient minimum contacts with the United States." *deSoto*, 245 F.3d at 567-68. In *deSoto*, the defendants did not dispute that they resided in the United States and, therefore, their contacts were sufficiently meaningful that the district court had personal jurisdiction. *Id.* at 568. Similarly, here, all parties reside in the United States and, accordingly, the Court has personal jurisdiction pursuant to the Federal Interpleader Act's

10

nationwide service of process provision.

**B.    Venue is proper in the Eastern District of Kentucky under the Federal Interpleader Act**

Alternatively, Defendant Yarbrough contends that venue is improper in the Eastern District of Kentucky and that this case should instead be transferred to a federal district court in Florida.  The parties dispute which venue provision—the general venue statute or the interpleader venue statute—applies here.   Defendant Yarbrough argues that the general venue statute, 28 U.S.C. § 1391, applies and that because she is a resident of Florida and the only remaining defendant, Florida is the only appropriate venue.  (Doc. # 36-1 at 10-11).[4]  Plaintiffs respond that, by its terms, the general venue statute, 28 U.S.C. § 1391, applies "except as otherwise provided by law"—and that this is an instance where the law provides otherwise.  Specifically, Plaintiffs point to 28 U.S.C. § 1397, which states that "[a]ny civil action of interpleader or in the nature of interpleader under section 1335 of this title may be brought in the judicial district in which one or more of the claimants reside."[5]

---

[4] Defendant Yarbrough argues that the interpleader venue statute, 28 U.S.C. § 1397, is inapplicable because decedent's estate never formally made a claim to Prudential for the death benefit.  (Doc. # 48 at 5). Defendant also argues that the proceeds of the death benefit are non-probate assets that are payable only to the named beneficiaries.  (Doc. # 48 at 4).  The implication is that because the estate has no possibility of being awarded the death benefit, it is not a proper claimant, which should preclude venue from being based on the estate's Kentucky residency.

As discussed *supra* Part II.A.1, however, at this first stage in the interpleader action, the Court may not consider the merits of any claimant's claim.  Rather, the Court must merely determine that multiple claimants have made claims on an identifiable stake.  *Gannon v. Am. Airlines, Inc.*, 251 F.2d 476, 486 (10th Cir. 1958)) ("But that went to the merits of the claim, not to venue.  It is not essential to venue in a case of this kind that a claim not patently baseless on its face be such as can be finally sustained in court").  The Court is satisfied that this standard has been met.

[5] Notwithstanding 28 U.S.C. § 1397's permissive language (an interpleader action "may be brought" in the district where at least one claimant resides) courts have interpreted this as a requirement, such that venue "must" or "shall" be in a judicial district where one or more of the claimants reside.  *Leader Nat'l Ins. Co. v. Shaw*, 901 F.Supp. 316, 321 (W.D.Okla. 1995) ("'May' is interpreted as mandating that any such action must be filed only where any claimant resides"); *Big Island Yacht Sales, Inc. v. Dowty*, 848 F.Supp. 131, 133

11

Plaintiffs correctly conclude that the general venue provision must yield to the interpleader venue provision. *See, Carolina Cas. Ins. Co. v. Mares*, 826 F.Supp. 149, 152 (E.D.Va. 1993). As one district court explained, "[t]he general venue provisions of § 1391(a), which apply to Rule 22, F.R.Civ.P., interpleader, are unavailable to" the stakeholder proceeding under statutory interpleader. *RCA Records, a Div. of RCA Corp. v. Hanks*, 548 F.Supp. 979, 982 (S.D.N.Y. 1982). The court explained that the Federal Interpleader Act created a comprehensive scheme, and after "accept[ing] the benefits" of nationwide service of process under statutory interpleader, the stakeholder may not "transform its action to a Rule 22 interpleader so as to validate its state of residence as a proper forum." *Id.* Similarly, because the Court's jurisdiction is founded on statutory interpleader, it will apply the interpleader venue statute.[6]

### 1. As used in the venue statute, "reside" is synonymous with "citizen"

The Federal Interpleader Act requires that venue be "in the judicial district in which one or more of the claimants reside." 28 U.S.C. § 1397. However, "[t]he interpleader-venue provision, § 1397, does not define 'reside,' and there are no instructive cases from

---

(E.D.Haw. 1993) (same).

[6] Though not raised by either party, courts have found that where interpleader is raised defensively, as a counterclaim or crossclaim, if venue was proper for the original claim, then it may be proper for closely related claims under theories of ancillary or pendent venue. *See, e.g., Nine Point Mesa of Nashville, Inc. v. Nine Point Mesa of Lexington, Inc.*, 769 F.Supp. 259, 263 n.4 (M.D.Tenn. 1991) ("Under the 'pendent venue' doctrine, if venue of the original federal claim is established, then proof of venue for any subsequent pendent jurisdiction claims, crossclaims, counter claims, or interpleader claims is unnecessary"). This would require analysis of whether venue was proper for the original claim under the general venue statute. The parties have neither raised nor briefed this issue. Because the Court finds venue proper under the interpleader venue statute, it does not reach this secondary basis for venue. Notably, however, the general venue statute permits venue where "a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(b)(2). In this case, the death benefit (i.e., the property that is the subject of this action) was paid into the Court's registry, located in the Eastern District of Kentucky, upon a joint motion by *all* parties—including Defendant Yarbrough. (Docs. # 32; 47)

the Sixth Circuit Court of Appeals." *Fort Dearborn Life Ins. Co. v. Jarrett*, No. 1:10-cv-77, 2010 WL 2035357, at *2 (W.D.Mich. May 20, 2010).  As such, courts apply the same definition of "reside" whether proceeding pursuant to the general or interpleader venue statute. *Id.* (citing 7 Fed. Prac. & Proc. Civ. § 1712).

This conclusion, in turn, leads to what one textbook has termed, one of the "mysteries that lurk within the easy language" of the venue statute: "the meaning of 'residence.'" Charles Alan Wright & Mary Kay Kane, *Law of Federal Courts* § 42 (6th ed. 2002).  Neither the parties nor the Court's research has uncovered a definition of "residence" (in the context of determining venue) that controls this case.  This is likely due to remaining "uncertainty" about whether "'residence,' within the venue statutes, means the same thing as 'citizen,' within the diversity statute." Wright & Kane, *Law of Federal Courts* § 42.  This uncertainty is the result of two divergent approaches courts have taken.  The minority approach holds that in the context of venue, "residence" is a narrow term that is encompassed by "domicil."[7] C.S. Patrinelis, Annotation, *Relationship Between "Residence" and "Domicil" Under Venue Statutes*, 12 A.L.R.2d 757 § 2 (2010).  This approach explains that "[w]hile a residence is not dependent upon intent, but may arise solely from the act of habitation, the predominant element in the acquisition or retention of a domicil is the animus manendi, or the intent to remain for an indefinite time." *Id.*; *see, e.g., Arley v. United Pac. Ins. Co.*, 379 F.2d 183, 185 n.1 (9th Cir. 1967) (referring to the federal venue statute and concluding that "[t]he statutory criterion is residence, not citizenship.  The terms are not

---

[7]  The Sixth Circuit has recognized that "it is well settled that citizenship for purposes of 28 U.S.C. § 1332(a) [diversity jurisdiction] means domicile."  *Stifel v. Hopkins*, 477 F.2d 1116, 1120 (6th Cir. 1973).  Thus, this Memorandum Opinion & Order uses "domicile" and "citizenship" interchangeably.

13

synonymous"); *Townsend v. Bucyrus-Erie Co.*, 144 F.2d 106, 108 (10th Cir. 1944) ("One may have a residence in a state while his citizenship continues in another").

By contrast, the majority view does "not observe this distinction between the terms, but assert[s] that they are synonymous." 12 A.L.R.2d 757 § 2. *See, e.g., Miller v. Prof'l Transp., Inc.*, No. 09-2152-JWL, 2009 WL 2601132, at *2 (D.Kan. Aug. 24, 2009)("[Defendant] is clearly a resident of Indiana, where he is domiciled"); *Manley v. Engram*, 755 F.2d 1463, 1466 n.3 (11th Cir. 1985) ("It is well settled that an individual's mere residence in a state is not enough for purposes of establishing the propriety of venue there. Rather, it is the individual's 'permanent' residence—i.e., his domicile—that is the benchmark for determining proper venue").

Lacking controlling precedent or an argument from the parties that "residence" differs from "citizenship" or "domicile," the Court adopts the majority view and treats the terms synonymously. The Court is persuaded by the view that "it would be far too confusing to have one body of law on what is 'citizenship' for purposes of diversity and a different body of law on what is 'residence' for purposes of venue." Wright & Kane, *Law of Federal Courts* § 42. Additionally, this approach is consistent with U.S. Supreme Court dictum which treated "residence" and "citizenship" interchangeably and explained that "residence" is used in the venue provision to "avoid the anomaly of referring to a 'citizen' of a district." Wright & Kane, *Law of Federal Courts* § 42 (citing *Ex parte Shaw*, 145 U.S. 444, 447 (1892)). At least one textbook has advocated this rationale as the "authoritative view." Wright & Kane, *Law of Federal Courts* § 42. Accordingly, the Court holds that a claimant "resides," for the purposes of the interpleader venue statute, in the same district as that party would be deemed a "citizen," for purposes of determining diversity jurisdiction.

14

## 2. The Court considers the residency of the co-administrators, not the decedent, to determine whether venue is proper

The Federal Interpleader Act requires venue in a "district in which one or more of the claimants reside." 28 U.S.C. § 1397. The Court has found that for the purpose of the interpleader venue statute, "reside" has an identical meaning to "citizen," as the term is used to determine diversity jurisdiction. There are three potential claimants to the stake: decedent's wife Yarbrough, decedent's mother Mudd, and decedent's estate. There is no dispute that Yarbrough resides in Florida and Mudd in South Carolina. The estate's residence, however, is less clear.

The Court must first determine whether, under the interpleader statute, 28 U.S.C. § 1397, the estate's residence is the same as the residence of the administrators or the residence of the decedent. Although the parties agree that the decedent's residence before his death is controlling, the Court disagrees. In support of their position, Plaintiffs cite 28 U.S.C. § 1332(c)(2)—the diversity jurisdiction statute—which requires that "the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent." Accordingly they conclude that "[t]he Co-Administrators of Mr. Mudd's Estate . . . are deemed citizens of the same state as their decedent." (Doc. # 43 at 2). Defendant Yarbrough does not contest this statement of law, but instead argues that decedent was "more likely than not a resident of the State of Florida." (Doc. # 36-1 at 11).

At first glance, this is a logical conclusion. Case law has found that "for the purpose of both statutory interpleader and general diversity jurisdiction the administrator of an estate has the same citizenship as the decedent." *Truck-A-Tune, Inc. v. Re*, 856 F.Supp. 77, 80 (D.Conn. 1993); *see also*, *Geler v. Nat'l Westminster Bank USA*, 763 F.Supp. 722, 726

15

(S.D.N.Y. 1991) ("For the purposes of both the interpleader statute and the general diversity jurisdiction statute, [the decedent's] administrator is treated as having the same citizenship as the decedent"). However, it does not necessarily follow that the administrator and decedent have the same citizenship for *venue* purposes. Accordingly, *Truck-A-Tune* and *Geler* do not control the question currently before the Court.[8]

Applying the jurisdictional rule, that the citizenship of the estate administrator is the same as decedent's citizenship, in the venue context, ignores the policy underlying the rule. Prior to 28 U.S.C. § 1332(c)(2)'s enactment in 1988, to determine federal diversity jurisdiction, the "universally received construction" was that "jurisdiction is neither given nor ousted by the relative situation of the parties concerned in interest, but by the relative situation of the parties named on the record." *Osborn v. Bank of United States*, 22 U.S. 738, 856 (1824). Thus, an estate administrator's citizenship controlled for the purpose of determining whether there was diversity of citizenship. This rule, however, permitted "the appointment of an out-of-state representative solely for the purpose of creating diversity of citizenship." 13E Fed. Prac. & Proc. Juris. § 3606. The enactment of 28 U.S.C. § 1332(c)(2) conclusively ended this practice.

The concerns about artificially created diversity that led to § 1332(c)(2), however, are not present in the venue context. As the Supreme Court has explained, "[v]enue is largely a matter of litigational convenience" while subject matter jurisdiction "concerns a court's competence to adjudicate a particular category of cases; a matter far weightier than

---

[8] This case law merely holds that determining "citizenship" for jurisdictional purposes is the same whether the jurisdiction is based on the Federal Interpleader Act or the general diversity statute; this case law does not address venue.

venue." *Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006). Thus, venue's concern for "litigational convenience" points to the administrator's residence, rather than the decedent's residence, as the touchstone for determining venue under the interpleader statute.

This conclusion is consistent with case law expressly finding that "[t]he administrator's personal residence is his place of residence for purposes of venue." *Smith v. Harris*, 308 F.Supp. 527, 528 (E.D.Wis. 1970); *see also*, *Martel v. Stafford*, 992 F.2d 1244, 1248 (1st Cir. 1993) ("[A]n executor's residence controls for venue purposes"); *Burnham v. Fulton*, Civ. A. No. 87-1575, 1987 WL 18872, at *1 (E.D.Pa. Oct. 26, 1987) ("Rather, the residence of an executor or administrator for venue purposes is his personal residence"); *Andrade v. Chojnacki*, 934 F.Supp. 817, 829 (S.D.Tex. 1996) (looking to the estate administrator's residence to determine venue where the Federal Tort Claims Act requires venue "in the judicial district where the plaintiff resides").

The Court finds this case law persuasive and, lacking controlling authority to the contrary, looks to the co-administrators' residence to determine venue under 28 U.S.C. § 1397.

### 3. Venue in the Eastern District of Kentucky is proper because the co-administrators reside here

As the Court held *supra* Part II.B.1, "reside," for the purposes of the interpleader venue statute, is defined the same as "citizen" is for diversity purposes. This, in turn, leads to the familiar two-prong citizenship test to determine whether the co-administrators are citizens of the Eastern District of Kentucky for purposes of venue: the first element is presence in a location and the second element is the intention to remain. *Von Dunser v. Aronoff*, 915 F.2d 1071, 1072 (6th Cir. 1990) (citing *Miss. Band of Choctaw Indians v.*

*Holyfield,* 490 U.S. 30, 48 (1989)). The Court begins with the foundational principle that "[a] person's previous domicile is not lost until a new one is acquired." *Id.* (citing *Kaiser v. Loomis*, 391 F.2d 1007 (6th Cir. 1968)).

There is no dispute that both co-administrators reside in the Eastern District of Kentucky. Decedent's sister, Amy Tuepker, filed an affidavit in which she stated that she is a co-administrator of the estate and resides in Erlanger, Kentucky. (Doc. # 38). Decedent's father, Lawrence Mudd, also filed an affidavit stating that he is a co-administrator of the estate and resides in Fort Mitchell, Kentucky. (Doc. # 39). There is no evidence in the record to suggest that either of the co-administrators are citizens of another state or that either will not remain in Kentucky. Accordingly, the Court is satisfied that the co-administrators of the estate are residents of the Eastern District of Kentucky, such that venue is proper here.

### 4. Alternatively, venue in the Eastern District of Kentucky is proper because decedent resided here before his death

As observed above, the parties agree that pursuant to 28 U.S.C. § 1332(c)(2), the estate's residence, for venue purposes, is the same as decedent's residence before he died. Though the Court has held to the contrary, for the sake of completeness, the Court will alternatively analyze decedent's residence. For the reasons set forth below, the Court finds that decedent was a resident of Kentucky.

As in the preceding section, citizenship is established by showing presence in a location and an intention to remain there. *Von Dunser*, 915 F.2d at 1072. And "[a] person's domicile is not lost until a new one is acquired." *Id.* When applicable, however, this analysis is supplemented by the "black-letter law that a person cannot acquire a domicile

of choice in a place if he is there by virtue of physical or legal compulsion." *Stifel v. Hopkins*, 477 F.2d 1116, 1121 (6th Cir. 1973). "The most obvious example [of this rule] is the serviceman" and it has, therefore, "long been the rule that presence at his military station, without more, cannot make the station his domicile because a serviceman is subject to the orders of his superior officer." *Id.* at 1122. Thus, "[s]ervice personnel are presumed not to acquire a new domicile when they are stationed in a place pursuant to orders; they retain the domicile they had at the time of entry into the service." 13E Fed. Prac. & Proc. § 3617 (collecting cases). This presumption can be rebutted by showing that the servicemember has established a domicile different than the one he had before he entered military service. *Stifel*, 477 F.2d at 1122. Though *Stifel* recognized varying standards of proof, it has stated that a servicemember will be found to have established a new domicile when circumstances "unmistakably indicate an intention on his part to abandon his former domicile and adopt a new one." *Id.* Other courts require proof of a change in a servicemember's domicile to be shown by "clear and unequivocal evidence." *In re Ski Train Fire In Kaprun, Austria on Nov. 11, 2000*, 257 F.Supp.2d 717, 726 (S.D.N.Y. 2003). It is Defendant Yarbrough's burden to meet this standard of proof. *Id.* at 726 n.12 (citing *Bowman v. DuBose*, 267 F.Supp. 312, 313-14 (D.C.S.C. 1967)).

Plaintiffs aver that venue in the Eastern District of Kentucky is proper because decedent was a Kentucky citizen. (Doc. # 43 at 11). Defendant Yarbrough's position is less clear. She states that "the Estate of Robert Lawrence Mudd is either a citizen of the State of Florida or a citizen of the Commonwealth of Kentucky . . . the Estate has a dual citizenship." (Doc. # 36-1 at 11). Yarbrough later concludes "that the decedent was more likely than not a resident of the State of Florida." (Doc. # 36-1 at 11).

Because it is undisputed that decedent enlisted in the Navy from Ft. Mitchell, KY (Docs. # 36-5; 38; 39), the Court begins with the presumption that decedent was a Kentucky citizen. Defendant Yarbrough can rebut this presumption with evidence that unmistakably indicates decedent's intent to abandon Kentucky as his domicile and adopt a new one. Though certainly not evidence in itself, Defendant's equivocation as to decedent's citizenship does not suggest that the required standard has been satisfied.

In *Stifel*, 477 F.2d at 1122, the Sixth Circuit set out a non-exhaustive list of indicia that show a servicemembers' intent to abandon a former domicile and adopt a new one: "[A]ffidavits of intention, transfer requests, registration for driver's licenses, opening bank accounts, addressing tax returns, motive for establishing domicile, and other physical facts evidencing that the desire to remain will not expire when the order requiring presence does." Courts also consider "purchasing or renting a home off-base, registering one's car in that state, obtaining a driver's license in that state, joining community groups, and testifying to one's intention to remain in the state where stationed." *Gambelli v. United States*, 904 F.Supp. 494, 497 (E.D.Va. 1995) (citing *Mizell v. Eli Lilly & Co.*, 526 F.Supp. 589, 592 (D.C.S.C. 1981)). Though case law provides numerous other criteria, the Court's analysis of decedent Mudd's intent is limited by the relative scarcity of evidence in the record.

The closest thing to a direct statement of decedent's intent is an affidavit from Defendant Yarbrough suggesting that decedent intended Florida to be his domicile. Yarbrough's affidavit states that when she and Mudd were first married in Florida in May 2004, Mudd listed his residence as Georgia and the parties lived in Georgia. (Doc. # 36-2 at 18 ¶ 4). Shortly thereafter, in December 2004, Mudd and Yarbrough bought a residence

in Florida, filed joint tax returns as Florida residents, owned vehicles registered in Florida, and (in Yarbrough's opinion) "considered Florida to be their residence." (Doc. # 36-2 at 18 ¶¶ 4-5). Less than a year after moving to Florida, in November 2005, Mudd re-enlisted in the Navy for an additional four years. (Doc. # 36-2 at 18 ¶ 5). Then, in May 2006, the parties divorced but both remained in Florida. (Doc. # 36-2 at 18 ¶ 6). The parties then remarried January 1, 2007 and listed their residence as Florida. (Docs. # 36-2 at 18 ¶ 7; 36-3). Mudd was transferred from his naval service in Florida to Hawaii in May 2007. (Doc. # 36-2 at 18 ¶ 8).

This evidence does not establish decedent Mudd's unmistakable intent to abandon Kentucky as his place of domicile. The record reveals that Mudd was in the Navy from 1998 until his death in 2010 and that he was transferred to Illinois, South Carolina, Georgia,[9] and Hawaii. (Docs. # 36-5; 38 ¶ 3; 39 ¶ 3). Mudd was, therefore, in these locations not by choice, but by order. Thus, as contemplated by *Stifel* and similar case law, decedent Mudd's location changes were ordered and standing alone do not show an intent to establish a new domicile. That decedent did not reside in Kentucky anytime after he joined the Navy in 1998 is irrelevant for the same reason.

The record also demonstrates that Mudd lived in Florida for only two-and-a-half of his nearly twelve years in the military—from December 2004 to May 2007. (Doc. # 36-2 at 18 ¶¶ 4, 8). Mudd's time in Florida is largely indistinguishable from his time stationed

---

[9] The record is unclear about whether Mudd's base was actually in Florida or just across the border in Georgia. Defendant Yarbrough states in her affidavit that Mudd received orders "transferring his naval orders from Jacksonville, Florida." (Doc. # 36-2 at 18 ¶ 8). Mudd's father and sister, however, state in their affidavits that Mudd was "stationed at Kings Bay, Georgia, and resided in Georgia and Florida" before being transferred to Hawaii. (Docs. # 38; 39). Whether Mudd was stationed in Kings Bay, Georgia or Jacksonville, Florida is immaterial to the pending motions because Kings Bay, Georgia is within commuting distance of Jacksonville, Florida.

elsewhere. For example, Defendant Yarbrough argues that when she and Mudd remarried in January 2007, they listed Florida as their residence on the marriage certificate. But when Yarbrough and Mudd married the first time, in May 2004, he listed his residence as Georgia. And in 2007, when Mudd filed a complaint for divorce, he listed Hawaii as his residence. (Doc. # 40-3 at 9).

*Stifel* also points to the address provided on tax returns as an indication of intent. In this respect, Defendant Yarbrough's counsel emphasized that he "has been advised" by the Kentucky Department of Revenue that decedent Mudd last filed a Kentucky income tax return in 2000. (Doc. # 48 at 2). But, there is no evidence in the record to support this statement. Defendant nonetheless concludes that this "evidences that the decedent did not consider himself a legal Kentucky resident from that point forward." (Doc. # 48 at 2).

Plaintiffs respond that Mudd's federal tax returns list various different addresses, which merely reflect the fact that he was transferred regularly; Plaintiffs argue that, if anything, the various addresses suggest that he did not intend to establish a domicile in any one of these locations. (Doc. # 43 at 14). For example, in tax year 2003, Mudd listed his address as the USS Nebraska; in 2006 he listed a Florida address; in 2007 he listed the USS Olympia; in 2008 he listed a Hawaii address; and in 2009 he listed a different Hawaii address. (Doc. # 44, attachments 1-5). Decedent Mudd's 2010 W-2, in turn, lists an Ohio address in addition to providing Florida as his state for income tax return purposes. (Doc. # 50-1). Because the evidence shows that decedent used his most current address for tax return purposes, the Court concludes that the addresses listed on decedent's tax returns do not show an unmistakable intent to establish the listed location as his domicile.

The Court recognizes that two facts distinguish decedent Mudd's time in Florida from his time in other locations. First, Mudd was married and lived with his wife while stationed in Florida. Where a servicemember's spouse lives can be considered in determining the servicemember's intended domicile. *Rosado-Marrero v. Hosp. San Pablo, Inc.*, 927 F.Supp. 576, 578 (D.P.R. 1996) (observing that the servicemember's wife lived where the servicemember was stationed, but returned to pre-service domicile for a pregnancy and when her husband was assigned overseas). The fact that a servicemember's spouse accompanies the servicemember, however, is not dispositive in determining domicile. *See, e.g.*, *Humphrey v. Fort Knox Transit Co.* 58 F.Supp. 362, 364 (W.D.Ky. 1945) *aff'd per curiam*, 151 F.2d 602 (6th Cir. 1945) ("Certainly, compulsory service by a soldier at an army post in another state, even though he brings his wife to a nearby town to be near him, does not operate as a change of domicile").

However, in this case, the fact that Mudd's wife lived with him in Florida carries little weight. As an initial matter, Yarbrough did not move to Florida with Mudd. Instead, the record suggests that Yarbrough was living in Florida when she met Mudd, and moved to Georgia when they were first married. Moreover, while Mudd lived in Florida, he and Yarbrough divorced then remarried. Lastly, Yarbrough moved with Mudd to Hawaii, but returned to Florida alone, after signing a separation agreement. In sum, the circumstances surrounding Mudd and Yarbrough's relationship do not evince Mudd's unmistakable intent to adopt Florida as his domicile.

The second distinguishing characteristic about Mudd's time in Florida is that he purchased a home there, which he did not do while stationed at any other location. Without more, however, purchasing an "off-base" home is insufficient to evidence an intent to

change domicile.  *Bowman v. DuBose*, 267 F.Supp. 312, 314 (D.C.S.C. 1967); *see also*, Lisa A. Zakolski, 25 Am. Jur. 2d Domicil § 28 (2d ed. 2010) ("If a soldier buys off-base housing [that] does not, in itself, prove the required intent to acquire a domicil").  This is precisely the situation here.[10]  Review of the evidence reveals that Defendant Yarbrough relies almost entirely on the fact that decedent Mudd purchased a home in Florida.  This alone does not establish Mudd's unmistakable intent make Florida his domicile.

Aside from the facts discussed above, the record provides scant evidence demonstrating decedent Mudd's intentions regarding domicile.  This void weighs against Defendant Yarbrough, as it is her burden to show decedent Mudd changed domicile.  Lacking evidence that unmistakably indicates decedent Mudd's intent to abandon Kentucky as his domicile and adopt Florida or another state as a new one, the Court concludes that decedent's estate is a citizen of Kentucky and that venue in the Eastern District is, therefore, proper.

### C.    Motion to Transfer for Improper Venue

Though Defendant Yarbrough's motion is titled "Motion to Dismiss for Lack of Personal Jurisdiction or Alternatively to Transfer," her memorandum in support argues only that venue is improper under 28 U.S.C. § 1391; it does not address the statutes, 28 U.S.C. §§ 1404(a) and 1406(a), or elements, that must be satisfied before the Court transfers this action.  Instead, Defendant appears to assume that if she establishes that venue is improper, she is automatically entitled to transfer.

---

[10]  Plaintiffs contend in a state court brief, which has been filed of record in this action, that "[t]he Florida real property owned by Mr. Mudd was not a marital residence, but rather was a duplex held for rental or investment purposes by Mr. Mudd."  (Doc. # 40-2 at 3).  Plaintiffs' counsel stated the same at oral argument.  Review of the record, however, uncovered no evidence in support.

Transfer is available in two scenarios. First, under 28 U.S.C. § 1404(a), the Court may transfer a case to a different venue "[f]or the convenience of parties and witnesses, in the interest of justice." Whether to transfer a case pursuant to § 1404(a) requires consideration of a number of factors. *See, e.g., Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 406 F.Supp.2d 751, 755 (E.D.Ky. 2005) (listing ten factors the court considered in determining whether to transfer the case for reasons of convenience). Defendant Yarbrough has not cited the applicable statute, nor has she listed the factors to be considered in determining whether transfer is appropriate.

The Court construes Defendant Yarbrough's motion as moving to transfer pursuant to 28 U.S.C. § 1406(a). That provision states that if the Court determines that venue is improper, it "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." Though Defendant does not cite this statute either, the substance of her argument is that venue is improper. This conclusion is in accord with the specific language of Defendant's motion: Defendant alternatively "moves this Court to dismiss this action on the grounds . . . that venue is not appropriate in the United States District Court for the Eastern District of Kentucky at Covington. *On this alternative ground*, this moving party requests that the action be transferred." (Doc. # 36 at 1). Because the Court has found that venue in the Eastern District of Kentucky is proper, Defendant Yarbrough's Motion to Transfer is **denied**.

### D. Motion to File an Amended Answer

Defendant Yarbrough has also moved to file an Amended Answer documenting her appointment as personal representative of decedent's estate in Duval County, Florida.

(Doc. # 35).  Though unsupported by briefing, Defendant's counsel indicated at oral argument that the Amended Answer was proposed to make the Florida estate a fourth claimant (in addition to the Kentucky estate, Mudd, and Yarbrough) to the death benefit.[11] Defendant's counsel explained that if the Court determines on the merits that the death benefit should be paid to the estate, then the Court would need to determine whether the Kentucky or Florida estate is the proper recipient.

Plaintiffs oppose the proposed Amended Answer on grounds that it would be futile. (Doc. # 40).  They attack the legitimacy of the Florida Probate Court's appointment by contending that the Florida probate proceeding was initiated without notice and after the Kenton probate proceedings were underway.  (Doc. # 40 at 1, 4).  Plaintiffs' counsel explained at oral argument that they were contesting the Florida Probate Court's appointment on these grounds.  Plaintiffs' counsel also indicated that the Florida Probate Court would hear the challenge to the appointment, thus leaving open the question of whether the Florida probate appointment would stand.  Defendant's counsel did not dispute this information.

Plaintiffs also argue that by denying Yarbrough's motion to dismiss for lack of subject matter jurisdiction, the Kenton Probate Court affirmed its jurisdiction over Mudd's estate and the Florida Probate Court is, therefore, precluded from exercising jurisdiction over Mudd's estate. (Doc. # 40 at 4, 6).  In support, Plaintiffs cite *Marshall v. Marshall*, 547 U.S.

---

[11]   The proposed Amended Answer requests relief by Defendant Yarbrough individually and as personal representative of the Florida estate.  (Doc. # 35).  Defendant's counsel stated at oral argument that he was relying on Rule 17, which permits a party to "sue in their own names without joining the person for whose benefit the action is brought."  Because Yarbrough is already party to this action, the estate would not need to separately join this action; the proposed Amended Answer would expand Yarbrough's capacity in this litigation to include representing the Florida estate's claim, as well as her own claim, to the death benefit.

293, 311 (2006) for the general proposition that when a probate court exercises *in rem* jurisdiction over a *res*, a second court will not assume *in rem* jurisdiction over the same *res*. (Doc. # 40 at 5). As Plaintiffs point out, however, the Kenton Probate Court has not issued a written opinion or order, so the Court is unable to determine over what *res* the Kenton Probate Court has exercised jurisdiction. (Doc. # 40 at 5). Does it include decedent's Florida property? Most importantly, does it include the proceeds from this litigation? The same questions apply to the Florida probate proceeding.

In sum, the record and briefing currently before the Court are inadequate to determine (1) whether the Florida appointment will stand and (2) the scope of the jurisdiction being exercised by the competing probate proceedings. Further, though Plaintiffs oppose Defendant's proposed Amended Answer as futile, neither party has offered any briefing on what criteria the Court should use to determine which estate is entitled to the death benefit—if the Florida appointment stands and the Court determines that decedent's estate (as opposed to a different claimant) is entitled to the death benefit.

Because the record and briefing are not sufficiently developed at present, Defendant Yarbrough's Motion for Leave to File an Amended Answer is **denied without prejudice**.

III.    **CONCLUSION**

For the reasons stated herein, **IT IS ORDERED** that,

1.    Defendant Yarbrough's Motion to Dismiss for Lack of Personal Jurisdiction (Doc. # 36) is **DENIED**;

2.    Defendant Yarbrough's Motion to Transfer to the United States District Court for the Central Division of Florida (Doc. # 36) is **DENIED**; and

3. Defendant Yarbrough's Motion for Leave to File an Amended Answer (Doc.

# 35) is **DENIED without prejudice**.

This 6th day of April, 2011.



Signed By:
*David L. Bunning*
United States District Judge